In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-111 CR


NO. 09-04-118 CR


____________________



DAWN KAY BEATY, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 258th District Court


Polk County, Texas


Trial Cause Nos. 17,180 & 17,181






OPINION


 Appellant, Dawn Kay Beaty, was charged under two separate indictments with
having obtained controlled substances by forgery, under the provisions of Tex. Health
& Safety Code Ann. § 481.129(a)(5)(A) & (B) (Vernon 2003). (1) Because one of the
controlled substances was listed in Schedule II of the Controlled Substances Act, and the
other controlled substance was listed in Schedule IV, appellant was facing punishment
exposure for both a second degree felony and a third degree felony. See Tex. Health &
Safety Code Ann. § 481.129(d)(1) & (2) (Vernon 2003); Tex. Health & Safety Code
Ann. § 481.032 (Vernon Supp. 2005). (2) A consolidated trial was conducted on both
charges with the jury finding appellant guilty in each cause. As appellant elected for the
trial court to assess punishment, a Pre-Sentence Investigation was ordered. Thereafter, the
trial court assessed punishment in each cause at confinement in the Texas Department of
Criminal Justice - Correctional Institutions Division for a term of ten years, but suspended
imposition of the sentences and placed appellant on community supervision for a period
of ten years. In each appeal, appellant raises the identical issue, complaining of legally
insufficient evidence to sustain the convictions "in that there is no evidence that Appellant
knew that the prescription form used to obtain the controlled substance was forged." For
the reasons stated below, we affirm the judgments in both causes.

 The record indicates that appellant brought a written prescription into the Wal-Mart
store pharmacy, located in Livingston, Texas, and later picked up the medications. The
prescription indicated the prescribing doctor, Achi Chary, M.D., issued it on January 22,
2003, to a "Laura Green," for "Lortab" and "Xanax." However, Dr. Chary testified at
trial that he did not write the prescription to "Laura Green," and that he had never seen
a "Laura Green." Dr. Chary further testified that he had seen and prescribed similar
medication to appellant on January 15, 2003. Dr. Chary also testified that a blank
prescription pad was stolen from his office. Therefore, anyone could have forged the
"Laura Green" prescription. 

 The jury also heard testimony from the Wal-Mart pharmacy manager, Jeffrey
Plunket. Mr. Plunket identified a Wal-Mart pharmacy signature log indicating that on
January 25, 2003, appellant signed her name and produced her driver's license so that she
could pick up the prescriptions for the fictitious "Laura Green." Mr. Plunket further
stated that a pharmacist at Wal-Mart noticed "some irregularities" on the "Laura Green"
prescription and called Dr. Chary's office to verify its validity. Dr. Chary's office
informed the pharmacist that Dr. Chary did not have a patient by the name of "Laura
Green." The record shows that Wal-Mart personnel filled the "Laura Green" prescriptions;
appellant picked up the "Laura Green" prescriptions on January 25, 2003; and Wal-Mart
personnel promptly called the police to report that the forged prescriptions for "Laura
Green" had been picked up. 

 Sergeant Anthony Lowrie of the Polk County Sheriff's Office testified that he
investigated the prescription forgery and subsequently conducted a videotaped interview
with appellant. Without objection, the videotaped interview was played to the jury. 
During the interview, appellant initially lied to Sergeant Lowrie as to how she acquired the
"Laura Green" prescription. Appellant first told Sergeant Lowrie that a woman she knew
only as "Missy" asked appellant to fill the prescriptions because she (Missy) had no
identification and "Laura Green" was not present. As appellant did have identification,
she agreed to get the prescriptions filled. When Sergeant Lowrie questioned the
truthfulness of appellant's story, she changed the story and indicated that the prescriptions
were actually for her friend, Jolynn Lawson. Appellant went on to describe her role in
helping Jolynn Lawson acquire controlled substances such as hydrocodone and alprazolam.
Appellant essentially admitted to having acquired her prescription on January 15, 2003,
from Dr. Chary under false pretenses, and then giving Jolynn Lawson all but one of the
prescribed controlled substances. During this taped interview, Sergeant Lowrie had
appellant provide a handwriting sample, which indicated to Lowrie that appellant was not
the person who wrote the "Laura Green" prescriptions. Appellant denied knowing the
"Laura Green" prescriptions were forgeries, and stated that had she known, she would not
have provided her driver's license to the Wal-Mart personnel when she picked up the
controlled substances. 

 The State's theory of the charges against appellant can be summed up by the
following direct testimony of Sergeant Lowrie: 

 Q.[State] What role did Dawn Kay Beaty perform in this investigation?


 A.[Lowrie] She filled a fraudulent prescription and dropped the pills off to
somebody. And during the interview, she - - she admitted that she did not
know the person on the prescription, that she's filled several of these
prescriptions before, that she did not know any of the people on the
prescriptions. 


 Q. And, in fact, did she state that, you know, she was filling these
prescriptions for Jolynn Lawson?


 A. Yes, she did.


 Q. And that she didn't know who Laura Green was?


 A. She did not know who Laura Green was. She thought it was an aunt.


 Q. And that she's done this on many, many times in the past?


 A. Yes, sir.


 Q. Filled prescriptions for Jolynn Lawson for other people?


 A. Yes, sir.


 Q. Now, just speaking to you as a citizen, hypothetically if your best friend
came up to you and gave you a prescription for someone that you didn't
know, would you go and fill that prescription?


 A. No, I would not.


 Q. Why wouldn't you?


 A. It just would seem suspicious to me.


 Q. And did Dawn Kay Beaty also admit to going to the doctor and getting
a script filled for herself on January 15th, 2003?


 A. Well, she admitted she went and had a prescription filled and it was in
her name. She did give those to the - - to Ms. Lawson, also. 


 Q. And that's what she told you, that she gave those in her name to Ms.
Lawson?


 A. Yes. They - - Ms. Lawson had actually paid for the doctor visit for the
pills. 


 Sergeant Lowrie further testified that he made telephone contact with Jolynn Lawson
and she agreed to come to the Polk County Sheriff's Office to meet with him. Ms. Lawson
advised Lowrie that "she had no idea what Ms. Beaty was talking about, that those are Ms.
Beaty's pills, and it went on from there." At that point, Sergeant Lowrie felt he did not
have enough evidence to file charges on Ms. Lawson. 

 Mental states are almost always inferred from acts and words. Moore v. State, 969
S.W.2d 4, 10 (Tex. Crim. App. 1998). "Mental culpability is of such a nature that it
generally must be inferred from the circumstances under which a prohibited act or
omission occurs." Id. (quoting Hernandez v. State, 819 S.W.2d 806, 810 (Tex. Crim.
App. 1991)). A defendant's mental state is "concealed within his own mind and can only
be determined from his words, acts, and conduct." Id. (quoting Norwood v. State, 135
Tex. Crim. 406, 120 S.W.2d 806, 809 (1938)). The jury in the instant cases was
instructed that a person acts "knowingly" or "with knowledge," with respect to the nature
of his conduct when he is aware of the nature of his conduct. See Tex. Pen. Code Ann.
§ 6.03(b) (Vernon 2003). Culpable mental state is most commonly grounded upon
inferences to be drawn by the factfinder from the attendant circumstances. Lane v. State,
763 S.W.2d 785, 787 (Tex. Crim. App. 1989). Thus, the jury may infer intent or
knowledge from any facts in evidence that tend to prove the existence of such a culpable
mental state. Hernandez, 819 S.W.2d at 810. 

 An essential element of the instant offenses is the knowing misrepresentation, fraud,
forgery, deception, subterfuge, or knowing use of a fraudulent prescription form to possess
or attempt to possess the controlled substances in question. As the culpable mental state
for this offense is similar to that required for conviction under the forgery provisions of
the Texas Penal Code, we look to such cases for guidance. See Tex. Pen. Code Ann. §
32.21(a)(1)(A) & (B), (b) (Vernon Supp. 2005). (3) In Griffin v. State, 908 S.W.2d 624
(Tex. App.--Beaumont 1995, no pet.), we reversed the conviction and ordered acquittal
of a defendant convicted of forgery, finding the evidence legally insufficient to prove he
intended to "defraud or harm another" when he presented a forged check made payable
to him. Id. at 626, 628. As we noted, in a forgery case, the culpable mental state requires
proof of knowledge that the check is forged, and if the State proves that an actor has
knowledge that a particular check is forged, proof of intent to defraud is inferred. Id. at
627 (citing Williams v. State, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985)). 

 In Griffin, after we reviewed the record evidence for "knowledge" of the forgery,
we looked to other cases addressing the issue and noted that "[i]n each opinion sustaining
a forgery conviction, there has been some additional evidence of 'suspicious
circumstances' which show that the defendant knowingly and intentionally passed the
forged check." Griffin, 908 S.W.2d at 627 (quoting Spencer v. State, 700 S.W.2d 300,
302 (Tex. App.--Austin 1985, no pet.)). The first example of "suspicious circumstances"
we listed was: "Where the defendant made an affirmative statement explaining possession
of the check which proved false." Griffin, 908 S.W.2d at 627 (citing, inter alia, Williams,
688 S.W.2d at 490). The record in the instant appeal reflects that appellant was a knowing
and willing participant in a scheme to acquire controlled substances having "a high degree
of abuse potential." Whether the identical medications acquired on January 15, 2003,
under false pretenses from Dr. Chary were turned over to Ms. Lawson or not, for
whatever reason, appellant chose to implicate herself in her interview with Sergeant
Lowrie in a scheme rooted in deceit and misrepresentation. More importantly, she began
the interview with the false explanation as to how she acquired the forged "Laura Green"
prescription and her role as merely doing a favor for "Missy." When confronted by
Sergeant Lowrie with this obvious lie, appellant provided the more incriminating version
of the purported events surrounding the "Laura Green" prescription. Nevertheless, she
insisted she had no knowledge of the fictitious nature of the prescription while acting as
a willing participant in the continued fraudulent acquisition of addictive controlled
substances. 

 Appellant frames her issue as one of legal insufficiency. When we review a
challenge to the legal sufficiency of the evidence, we view the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of fact could have
found the essential elements of the offense proven beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Moff v. State, 131
S.W.3d 485, 488 (Tex. Crim. App. 2004). In examining the record evidence in the light
most favorable to the verdict, we disregard any evidence that does not support the verdict. 
See Clewis v. State, 922 S.W.2d 126, 132 n.10 (Tex. Crim. App. 1996). We consider all
of the "light most favorable" evidence presented, whether properly or improperly
admitted. See Miles v. State, 918 S.W.2d 511, 512 (Tex. Crim. App. 1996). This
standard leaves to the factfinder the responsibility to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. See
Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000). The factfinder is the sole
judge of the credibility of the witnesses and the weight given their testimony. Tex. Code
Crim. Proc. Ann. art. 38.04 (Vernon 1979). Thus, the factfinder is free to accept or
reject any or all of a witness's testimony. See Margraves v. State, 34 S.W.3d 912, 919
(Tex. Crim. App. 2000). The jury in the instant appeal was presented with sufficient
evidence to reasonably infer that appellant presented the "Laura Green" prescription to the
Wal-Mart pharmacy with full knowledge that the prescription was not the act of Dr.
Chary. We must disregard appellant's protestations to the contrary under a legal
sufficiency analysis. Issue one is overruled in both causes, and the judgments in both
causes are affirmed.

 AFFIRMED.

 ________________________________

 STEVE MCKEITHEN

 Chief Justice 


Submitted on February 9, 2005

Opinion Delivered February 16, 2005

Publish

Before McKeithen, C.J., Gaultney and Horton, JJ.
1. Simply entitled "Offense: Fraud," section 481.129 provides, in pertinent part: 

 (a) A person commits an offense if the person knowingly:

 (5) possesses, obtains, or attempts to possess or obtain a controlled
substance . . . 

 (A) by misrepresentation, fraud, forgery, deception, or
subterfuge; [or]

 (B) through use of a fraudulent prescription form; . . .
2. In trial cause number 17,180, appellant fraudulently obtained the generic substitute
of Xanax (Alprazolam), listed in Schedule IV of the Controlled Substances Act, and also
fraudulently obtained the generic substitute of Lortab (Hydrocodone), listed in Schedule
II. Also, revisions to section 481.032 took effect on January 1, 2003. As these revisions
have no application to the controlled substances in the instant causes, we refer to the
current version of section 481.032 to lessen confusion. 
3. Although revisions to section 32.21 took effect on September 1, 2003, they have
no impact on the section for purposes of our analysis. We therefore refer to the current
version to lessen confusion.